THE PHILADELPHIA, WILMINGTON AND BALTIMORE
RAILROAD COMPANY *vs.* CAROLINE HOEFLICH and
PHILIP HOEFLICH, her Husband.

*Railway train—Fare of Child—Ejection of Passenger from*
*Railway train—Measure of Damages—Punitive damages.*

A passenger on a railway train is responsible for the fare of a child
under his charge, and upon refusal to pay the same, may, together
with the child, be ejected from the train, although he had paid his
own fare.

If a conductor on a railway train finds a child setting beside a female
passenger, and knows that the father of the child is in the car, or
could know upon proper inquiry, he has no right to hold the female
passenger responsible for the child's fare.

A passenger wrongfully ejected from a railway train is entitled to
recover from the railway company such damages as in the judg-
ment of the jury, under all the circumstances of the case, would be
a proper compensation for the unlawful invasion of his rights as a
passenger, and for the injury to his person and feelings.

A passenger on a railway train, though forcibly and wrongfully ejected
from the train by an officer of the railway company, is not entitled
to punitive damages, if the wrongful act were committed in the
discharge of a supposed duty, or without any evil or bad intention.

To entitle a person to punitive damages for a wrongful act, there
must be an element of fraud or malice, or evil intent, or oppression,
entering into and forming part of the act.

APPEAL from the Court of Common Pleas.

This action was brought by the appellees against the
appellant, to recover damages for ejecting the female
plaintiff from a car on its road.

*Exception.*—The testimony being closed on both sides,
the plaintiffs offered the two following prayers:

1. If the jury find from the evidence, that the female
plaintiff, on or about the first of October, 1882, purchased a

ticket entitling her to transportation over the defendant's railroad, from Baltimore to Magnolia Station, and that while travelling on said ticket along with her father and younger sister, the conductor demanded fare for the child, which was not paid by either the female plaintiff or the father, and that the conductor knew that the man who was travelling in company with the plaintiff and her sister was their father, and a proper person to take charge of the child, or by the exercise of reasonable care under all the circumstances, might have so known; and shall further find, that before reaching Magnolia Station, the female plaintiff, while properly conducting herself on said train, and after the conductor had taken up her ticket, was forcibly ejected from the cars by the defendant's agents, then the plaintiffs are entitled to recover.

2. If the jury find for the plaintiffs under their first prayer, then they should award such damages as will, under all the circumstances of the case, compensate the female plaintiff for the injury to her person and feelings suffered by reason of the unlawful acts of the defendant; and if they believe that said unlawful acts were deliberately and forcibly done, then they may give such exemplary damages as they may consider a proper punishment for the conduct of the defendant, acting through its agent, the conductor.

The defendant specially excepted to the plaintiffs' first prayer on the following grounds:

1. That there was no legally sufficient evidence to sustain the same.

2. That it submitted a question or questions of law to the jury.

The defendant offered the two following prayers:

1. If the jury shall believe from the evidence, that about the 1st day of October, 1882, the female plaintiff, Caroline Hoeflich, got upon a train of defendant at Baltimore, having with her a child of about twelve years of age, both

intending to go upon the said train to Magnolia, whither the train was bound; and after the train had started, the conductor asked the female plaintiff for tickets, and she produced one for herself from Baltimore to Magnolia, but produced none for the child; and that the child was sitting in the seat with her; and that the conductor asked if the child was with her; and she said the child was; and he then asked the female plaintiff the age of the child; and she thereupon said that the child was twelve years of age; and that the conductor then said the female plaintiff must pay half fare for the child from Baltimore to Magnolia; and that the female plaintiff refused so to pay for the child; and that the conductor told her that if she did not do so, he would be obliged to put off the train the child, and with her the female plaintiff; and that the female plaintiff still refused to pay the half-fare for the child; and that thereupon, the conductor of the defendant's train, put the female plaintiff and the child off the same, at Chase's Station, then the plaintiffs are not entitled to recover.

2. If the jury shall believe from the evidence, that on or about the 1st day of October, 1882, the female plaintiff, Caroline Hoeflich, came with her father and a sister about twelve years of age, to the depot of defendant at President street, in the city of Baltimore, and bought two full tickets, one for her father and one for herself, to Magnolia Station on defendant's railroad, and that shortly afterwards they all three got on a train of defendant bound from President Street Station for Magnolia Station, and that the female plaintiff took a seat in a car of the train, and that the child took a seat beside her, and that her father was not with them when the conductor came through for tickets after the train left Bay View, and that the conductor did come through the train after leaving Bay View, and asked the female plaintiff for tickets, and that she thereupon gave the conductor the two full tickets from Baltimore to Magnolia, and said that one was for

Phil., Wilm. & Balt. Railroad Co. *vs.* Hoeflich.

herself, and the other for a gentleman in the end of the car, or in the baggage car, and that the conductor then asked plaintiff if the child was with her, and she said the child was, and he then asked her for a ticket for the child, and that the female plaintiff said that she had none for her, and that the conductor then asked the female plaintiff the child's age, and that the female plaintiff said the child was twelve years of age, and that the conductor then said the female plaintiff must pay half-fare for the child, and that the female plaintiff refused to pay the same, and that the conductor told the female plaintiff that unless she paid the same he would put her and the child off the train, and that the female plaintiff did not tell the conductor that the father of herself and the child was on the train, and did not refer the conductor to him for the child's fare, and that the female plaintiff still refused to pay the half-fare for the child, and that the conductor of the defendant's train did thereupon put the female plaintiff and the child off the train, and in doing so used no more force than was necessary to overcome the resistance that they made, then the plaintiffs are not entitled to recover, and their verdict must be for the defendant.

The Court, (Brown, C. J.,) granted the plaintiffs' prayers, and rejected those of the defendant. The defendant excepted. The jury rendered a verdict in favor of the plaintiffs for the sum of $2,500, and judgment was entered thereon. The defendant appealed.

The cause was argued before Alvey, C. J., Yellott, Miller, Robinson, Ritchie, and Bryan, J.

*Henry J. Bowdoin,* and *John J. Donaldson,* for the appellant.

*Charles Brandau,* and *William A. Hammond,* for the appellees.

ROBINSON, J., delivered the opinion of the Court.

The female plaintiff with her father, and a younger sister, eleven years of age, got upon the defendant's train at Baltimore for the purpose of going to Magnolia Station. When the conductor came around she handed him two, tickets, one for herself and the other for her father, who was in another part of the car. The younger sister was sitting beside her, and the conductor asked, "is *this girl with you?*" She answered "yes." Thereupon he said he must collect half-fare for the girl, which the plaintiff refused to pay. In a few minutes the conductor returned, and again demanded payment of the child's fare, and which was again refused by the plaintiff. After making the demand a third time, the conductor told her unless the fare was paid he should be obliged to put her and the child off at Chase's Station, and the plaintiff still refusing to pay the same, she and the child were both put off the train.

The plaintiff had paid her own fare and the defendant had no right of course to eject her from the train, unless there was a contract *express* or *implied* on her part to pay the fare of her younger sister. There is no evidence of an express contract, and if one is to be implied, it must be on the ground that the younger sister was under her charge, and being under her charge, and thus responsible for her presence on the car, it was her duty to see the fare was paid. The defendant was under no obligation of course to carry the younger sister, without being paid a reasonable compensation, and if she was under the plaintiff's charge it is but fair and reasonable to hold her responsible for the fare. Under such circumstances the law would imply an agreement on her part to pay the fare of the child, and if she refused to pay it, the defendant had the right to put off both the plaintiff and the child— the plaintiff because she had not complied with the contract on her part implied by law, and the child because

the company was not required to carry it unless its fare was paid according to the rules and regulations of the company.

But it seems the father of the child was in fact in the car, and if so, he was as the natural guardian and protector of his child liable for the payment of its fare. And although the conductor found the child sitting beside the plaintiff, yet if he knew the father was in the car, or the circumstances were such as to put a reasonable person on the inquiry, he had no right to hold the female plaintiff responsible for her sister's fare. And this we think was a question for the jury. Now he did inquire, it is true, whether "*the girl sitting* beside the plaintiff was with her," to which she replied "yes;" and if the case rested here it might be said that he was justified in acting on the presumption that the girl was under the plaintiff's charge. But the plaintiff says she told him her father was in the car, and although this is denied by him, the proof shows beyond question that he knew there was a man travelling in company with the plaintiff and her sister, and that he interfered for their protection when they were being put off, and further, that he went off with them. So whether the conductor knew or might have reasonably known by proper inquiry that this man was their father, was, under all the circumstances, a proper question to be submitted to the jury. If he did know it, or the circumstances were such as to put him on the inquiry, he had no right of course to eject the plaintiff from the train; and there was no error in granting the plaintiffs' first prayer. For the same reasons the defendant's prayers were properly refused.

All the facts set forth in these prayers, namely : That the younger sister was sitting beside the plaintiff, that the latter in reply to the inquiry of the conductor, is this girl with you, said "yes,"—that he thereupon demanded of her the payment of half-fare for the girl, which she refused

to pay; that he told her it would be his duty to put both her and the child off, unless it was paid; that she did not tell him the child's father was in the car, nor refer him to the father for the fare of the child; all these facts might be found by the jury, and yet when considered in connection with other facts, it would not necessarily follow that the conductor was justified in assuming that the child was under the plaintiff's charge, and that she was, therefore, liable for the payment of its fare. Although the plaintiff may not have told him that the child's father was in the car, and that he was the proper person to pay its fare, yet he knew there was a man in company with the female plaintiff and her sister, and the question comes up, whether under the circumstances it was not his duty, before resorting to the extreme measure of ejecting a woman and a child, to have inquired what relation this man bore to them. This question is by the defendant's prayers excluded from the jury.

Nor can these prayers be supported on the ground that the facts, thus relied on, *estop* the plaintiff from maintaining this suit. She ought no doubt to have referred the conductor to the father for the payment of the child's fare. But she was a passenger, and as such had a right to stand on her own rights, and the conductor was acting on his own responsibility. Her conduct cannot fairly be said to amount to bad faith, such as would estop her from bringing this suit. In reply to the conductor's inquiry, she said the child was with her, but not necessarily in the sense that the child was under her charge and protection. Besides, the conductor knew there was a man in company with them, and although she did not tell him that he was the girl's father, yet this he could have learned by proper inquiry.

We come now to the only question, about which we think there can be any difficulty in this appeal, and that is the question in regard to the rule of damages laid down

Phil., Wilm. & Balt. Railroad Co. *vs.* Hoeflich.

by the Court. If the plaintiff was wrongfully ejected from the train, she was unquestionably entitled to recover such damages as the jury might think, under all the circumstances, a proper compensation for the unlawful invasion of her rights as a passenger, and the injury to her person and feelings. To so much of the plaintiffs' prayer, there can be no objection. But in addition to such damages as these, the Court instructed the jury, if the plaintiff was *forcibly* and *deliberately* ejected, they might give such exemplary damages, as they might think a proper punishment for the conduct of the defendant. The force and deliberation with which the wrongful act is done, are not necessarily the tests by which the question of punitive damages is to be determined. On the contrary, to entitle one to such damages there must be an element of fraud, or malice, or evil intent, or oppression entering into and forming part of the wrongful act. It is in such cases as these that exemplary or punitive damages are awarded as a punishment for the evil motive or intent with which the act is done, and as an example or warning to others. But where the act, although wrongful in itself, is committed in the honest assertion of a supposed right—or in the discharge of duty, or without any evil or bad intention, there is no ground on which such damages can be awarded.

In the *Phila., Wilm. and Balt. Railroad Company vs. Quigley*, 21 *How.*, 202, 214, Mr. Justice CAMPBELL says: "Whenever the injury complained of has been inflicted maliciously or wantonly, and with circumstances of contumely or indignity, the jury are not limited to the ascertainment of a simple compensation for the wrong committed against the aggrieved person. But the malice spoken of in this rule is not merely the doing of an unlawful or injurious act. The word implies that the act complained of was conceived in the spirit of mischief, or of criminal indifference to civil obligations."

And in the still later case, in the same Court, of *Milwaukee, &c., Railroad Co. vs. Arms, et al.*, 1 *Otto*, 489, 493, Mr. Justice Davis said:

"Redress commensurate to such injuries should be afforded. In ascertaining its extent, the jury may consider all the facts which relate to the wrongful act of the defendant, and its consequences to the plaintiff; but they are not at liberty to go farther, unless it was done wilfully, or was the result of that reckless indifference to the rights of others which is equivalent to an intentional violation of them. * * * The tort is aggravated by the evil motive, and on this rests the rule of exemplary damages."

We might multiply the cases on this subject if necessary, all concurring that exemplary damages are awarded as a punishment for the evil motive, or intention with which the unlawful act is done, and as a warning or example to others.

The mere fact, that one is forcibly and deliberately ejected from a railroad car, does not necessarily imply that it was done wantonly, or wilfully, or with a bad motive, although the act may be in itself unlawful. Conceding then that the female plaintiff was wrongfully ejected from the car, the fact that it was forcibly and deliberately done are not the tests by which the plaintiffs' right to recover punitive damages is to be determined. On the contrary, before resorting to so extreme a measure, it was but proper that the conductor should have acted deliberately and not hastily or inconsiderately; and if the plaintiff refused to leave the car on being requested to do so, the use of force became absolutely necessary, the only question being whether the force thus used was excessive.

The case of the *Baltimore and Yorktown Turnpike vs. Boone*, 45 *Md.*, 344, on which the instruction of the Court is based differs widely from the one now before us. There the company in violation of its charter, had exacted illegal

Phil., Wilm. & Balt. Railroad Co. *vs.* Hoeflich.

and excessive fares, and passengers were compelled either to pay the same, or subject themselves to be expelled from the cars. It was under these circumstances, the Court held, that public policy required the Corporation should be liable to the highest measure of damages, for the deliberation and force accompanying its illegal conduct. But there are no considerations of public policy that require the application of such a rule in a case like the one now under consideration. On the contrary, to entitle the plaintiff to recover punitive damages, according to all the decisions both in this country and in England, the jury must find that the wrongful act was done wantonly, or wilfully, or in the spirit of oppression. It is the evil motive or intention with which the wrongful act is done, say the Supreme Court, on which rests the rule of punitive damages.

The Court was wrong therefore in instructing the jury that the plaintiff was entitled to punitive damages, if they should find the wrongful act complained of was *deliberately and forcibly done.*

> *Judgment reversed, and*
> *new trial awarded.*

(Decided 18th June, 1884.)

BRYAN, J., filed the following dissenting opinion:

I dissent from the reversal of this judgment. I also dissent from the reversal of the judgment in the case of John W. Rice, which was decided at the present term on the authority of this case.

As the principal question in both cases was identically the same, it is convenient to consider them together. Rice brought suit against the Philadelphia, Wilmington and Baltimore Railroad Company, and recovered judgment. It appears that he purchased a ticket on the thirtieth day of January, 1883, at the ticket office of the defendant. The ticket was in two coupons; one of which shewed that the

plaintiff was entitled to transportation from Wilmington to Philadelphia, and the other from Philadelphia back to Wilmington. While he was on his way to Philadelphia, in one of the defendant's cars, the conductor of the train tore off the return coupon and cancelled it by punching. In a moment afterwards the conductor said to the plaintiff, "I have made a mistake; I will make it all right;" and then wrote on the back of the cancelled coupon these words in lead pencil: "cancelled by mistake;" and gave it back to the plaintiff, saying: "it is all right, you can use the ticket." On the following day the plaintiff went to the depot in Philadelphia, for the purpose of taking the early express to Wilmington; the gate-keeper noticed that the ticket had been punched, but on hearing from the plaintiff the explanation of the circumstances, he said: "excuse me, that is all right;" and permitted him to go through the gate. The plaintiff entered the cars, and was proceeding on his journey when he was ejected from them by the conductor, who then had charge of the train, and who was a different person from the one who had punched the ticket on the previous day. It is unnecessary for the present purpose to consider the conflict of testimony about the manner and the circumstances of the ejection. The plaintiff offered evidence to the effect that it was violent and brutal; and the testimony on the part of the defendant tended to show that the conductor made the removal without unnecessary force, and because the cancelled ticket had not been marked in the manner required by a regulation of the Railroad Company. There seems to be no question in the mind of the Court that the above recited facts, if found by the jury, entitled the plaintiff to a verdict. But the measure of damages has given rise to a difference of opinion among us. The Court below instructed the jury both in *Rice's Case* and *Hoeflich's,* that if they found for the plaintiff (under an instruction previously given) that they "should award such sum as damages as

Phil., Wilm. & Balt. Railroad Co. *vs.* Hoeflich.

will compensate him (*or her*) for the injury to his person, feelings, and character arising from the unlawful act of the defendant, and if they believe that said unlawful act was deliberately and forcibly done, then they may give such exemplary damages as they may consider a proper punishment for the conduct of the defendant, acting through its agent, the conductor."

It has been a rule of the common law from the earliest period, that where an act occasioning an injury to another is unlawful, a right of action accrues without regard to the intent of the wrong-doer. If the wrongful act causes an immediate injury, *trespass vi et armis* is the proper remedy; but, if the injury is consequential, the form of action is *case*. Under no circumstances is it necessary for the plaintiff to show the intent of a person who has committed an unlawful act resulting in his injury. If, however, a person be engaged in the performance of a lawful act, and the injury be unintentional, unavoidable, and without the least fault on the part of the doer, no action would lie. The unlawfulness of the act determines the right of action; and the question, whether the injury was immediate or consequential, settles the form of the remedy. In a number of instances, the Courts have awarded damages where the injury was unintentional. It is not necessary to refer particularly to them. The familiar cases of *Weaver vs. Ward*, and *Underwood vs. Hewson*, cited in *Chitty's Pleading*, illustrate the rule. In the first of these cases, the defendant, while exercising in the trainbands, fired his musket, and by accident hurt the plaintiff. In the second, the defendant was uncocking his gun, when it went off, and accidentally wounded a bystander. In each instance, the person doing the injury was held liable to an action of *trespass vi et armis*, because the injury although unintentional was immediate. And in *Cross vs. Kent*, 32 *Md.*, 581, this Court held that a lunatic was liable for the value of property which he had burned up,

and that it was not competent to reduce the damages below the value of the property destroyed, by proving his lunacy, or by proving that the burning was the result of accident. In all cases of this kind the law fixes indemnity and redress, as the measure of damages to be recovered by the injured party.

But there are cases in which injuries are committed intentionally, and these vary infinitely in their circumstances; running through all the gradations of wrongdoing, from slight indifference to the rights of another, up to hostile, malevolent, and oppressive invasion of them. .The law takes cognizance of all these circumstances, and permits the damages to be increased beyond indemnity and redress in proportion to the matters of aggravation. We find in this Court that this principle has been invariably maintained. In *Shafer vs. Smith,* 7 *H. & J.*, 68, it was held, that the plaintiff might for the purpose of increasing the damages give in evidence the circumstances which accompanied, and gave character to the trespass. And in many subsequent cases, the Court has reiterated this doctrine in the very words in which it was first declared. Many particulars of misconduct have been considered by this Court, and stated as matters proper to inflame damages. It may be well to mention some of them. In *Bond vs. Ridgely,* 17 *Md.*, 14, where a defendant had committed a trespass on land, knowing that it was not his, the jury were not limited to the damages committed, but were allowed to find such further damages as the facts and circumstances might warrant. In *Dailey vs. Grimes,* 27 *Md.*, 440, where the action was brought for taking and selling property under a distraint where no rent was due, it was held that, in estimating the damages, the jury were not limited to the value of the property taken and sold. In *Young vs. Mertens,* 27 *Md.*, 127, it was held that if the defendant wrongfully took the plaintiff's property without his consent, the jury in fixing the damages were not con-

fined to the-value of the property when so taken. In *Strasburger vs. Barber*, 38 *Md.*, 108, it was ruled that the jury might assess more than the actual damage for the injury, if the defendants acted after notice and wantonly. It may be well here to notice *Breinig's Case*, 25 *Md.*, 378. It is stated in the head-note that where there is no evidence of wanton and malicious, or gross and outrageous conduct on the part of the defendant, actual damage is the limit of the plaintiff's recovery. This question was not before the Court of Appeals, and was not decided by it; and as an abstract proposition the principle announced is erroneous. The case as shown by the evidence was not one calling for exemplary damages, and the Court below so decided; but the appeal of the defendant did not bring up the question to this Court for review, and no opinion was expressed upon it. The damages are liable to be increased by every circumstance of aggravation which raises the wrong above the level of an unintentional injury, although they fall far short of wanton malice or gross outrage.

No doubt many general expressions may be found in the books, similar to those quoted in the opinion of the majority of the Court, and it is not denied that they were appropriate to the occasions on which they were used. But the safe and sound rule in estimating the value of a decision is to consider the facts which were in judgment, and to apply the general language of the Court to these particular facts. Great errors frequently are committed by applying them to other and different circumstances. That the right to give exemplary or vindictive damages is not limited in the manner stated in the opinion of the majority of the Court may be seen from very early cases. The case of *Huckle vs. Money* was tried in the Court of Common Pleas, in the year 1763. It was an action of trespass for assault and imprisonment. The defendant attempted to justify under the general warrant of a Secretary of State, com-

manding the apprehension of the printers and publishers
of the celebrated *North Briton*, number 45, without speci-
fying the name of any person in the warrant.   The Court
overruled the defence, and the jury gave a verdict for
three hundred pounds damages.   The report of the case
states that the defendant kept the plaintiff in custody
about six hours, "but used him very civilly by treating
him to beef-steaks and beer, so that he suffered very little
or no damages."   The Court on a motion for a new trial
refused to interfere with the damages, and sustained the
verdict.   2 *Wilson*, 205.   And in the subsequent case of
*Beardmore vs. Carrington, et al.*, reported at page 244 of the
same volume, the Court sustained a verdict for a much
larger amount under similar circumstances.   In this latter
case, the plaintiff's house had been entered and his books
and papers seized, and he had been imprisoned for six
days in the defendant's house.   The same justification
was set up as a defence, and overruled, and the jury gave
a thousand pounds damages.   The evidence showed that
no violence was offered to the person of the plaintiff, and
that his wife was permitted to be with him, and that he
was permitted to go to any part of the defendant's house,
while he was confined there.   The Court decided that the
jury had a right to give vindictive damages in these cases,
because of the outrage on the plaintiffs in violating their
right of personal liberty and personal security.   It was
admitted on all sides at the trial that there had been a
great many precedents of warrants like those in question
in these cases, but they were held by the Court to be un-
lawful, and those who executed them were held to a strict
and severe responsibility.   It will be observed in these
cases, that the defendants had no evil or malicious pur-
pose against the plaintiffs, and that there were no circum-
stances attending the execution of the warrants which
showed wantonness, indignity, or a contemptuous disre-
gard of the plaintiffs' rights, but quite the contrary; the

defendants were in the mildest manner executing warrants. issued by a high officer of the Government in accordance with a long usage never before questioned. In the opinion of the Court this language is used: "It was strongly argued at the trial of this cause, that the jury were to measure the damages by what the plaintiff had suffered by this trespass and six days and an half imprisonment; but this was thought a *gross absurdity* by the Judge who presided there." It is well known that these cases were decided by the illustrious CAMDEN; and it may be added that no judgment of that great man has ever received more general and cordial approval.

The second instruction given by the Court on the prayer of the plaintiffs, it will be remembered, is based on the hypothesis that the jury should find the facts embraced in the first instruction, which showed that the ejection from the cars was unlawful. The act being found to be unlawful, it was declared to be properly punished by exemplary or vindictive damages, if it was deliberately and forcibly done. Let us examine this instruction for a moment. A forcible trespass upon the person of another is a crime; and the law deals with crimes by meting out punishment to those who commit them. And if a crime be committed with deliberation it assumes a darker hue. The law makes due allowance for the infirmities of human nature, and mitigates its penalties to those who act under the impulse of sudden passion or excitement; but it punishes with great severity crimes committed with deliberation. Force is abhorrent to the genius of the law. It is the oppression of the weak by the strong. But the law arrests the aggressions of the violent, and protects the feeblest in the enjoyment of their rights. It seeks and maintains peace, and makes its own enlightened reason the arbiter of wrongs. On the hypothesis of the second instruction, the plaintiff had a right to remain in the cars; and it can certainly be no extenuation of the force by which he was

deprived of his right, to say that the wrong could not be committed without force. The transaction was in law an assault and battery committed for the purpose of taking from the plaintiff a right which he had purchased and paid for. This Court held in *Blocher's Case* that where an injury was committed either with *force* or *malice*, the injured party might recover vindictive damages. 27 *Md.*, 287. And in *Boone's Case*, 45 *Md.*, 344, an instruction in the very words of this second prayer was held by this Court to be correct; and this ruling was approved in *Larkin's Case*, 47 *Md.*, 155.

The deliberation in *Boone's Case* was not greater than that shown in *Rice's*. By the fourth prayer offered in *Rice's Case* on the part of the defendant, it was attempted to exempt the Railroad Company from exemplary damages on the ground, that the conductor was carrying out in good faith a rule of the Railroad Company, and was acting without unnecessary violence. By that rule the conductor was authorized to refuse the ticket, because it was not marked in a particular way by the other conductor who had improperly punched it. Now we may ask to whom was it owing that the ticket was not thus marked? Undoubtedly if there was fault anywhere, it was on the part of the conductor, who in this behalf was acting in the course of his employment, and represented the Railroad Company. The injustice of a rule, which because of the neglect of one of its own officers, attempted to forfeit the rights of a passenger who had been guilty of no wrong, is quite as striking as that of the rule condemned by this Court in *Boone's Case;* and as the Railroad Company acted in the adoption of this rule as advisedly and deliberately as the defendant did in *Boone's Case*, the same consequences ought to follow. The concluding passage in the Court's opinion in this last mentioned case is too apposite to be omitted: "In undertaking to adopt regulations to operate upon the public in detail affected by its action, it

Phil., Wilm. & Balt. Railroad Co. *vs.* Hoeflich.

had the opportunity from its character as a corporation, to determine at its leisure, its policy ; and could not well claim to be excused for hasty and illegal conduct. If the result of such determination was the establishment of rules, either to compel the passenger, availing himself of his legal right to travel in its cars, to pay an unwarranted and illegal exaction, or be compelled to submit to his expulsion therefrom by force, through its subordinates, with all the attendant indignity, it thereby assumed the hazard of subjecting itself to the highest measure of damages, for the deliberation and force accompanying its illegal conduct. This would seem to be a reasonable consequence. It should be careful to keep within the limits of the law, and not encroach upon the rights of any passenger. By transcending such bounds deliberately and forcibly, public policy demands, that it shall be compelled to incur the highest grade of damages to a party aggrieved by its unlawful action, according as the sound discretion of an intelligent jury may determine." The rule to which the Court alludes was this: The defendant required its conductors to demand the sum of twelve cents from every passenger travelling on its road, from any point of the first mile in Baltimore County to any point inside the city, when he had not obtained a ticket at the office of the company, and to give to the passenger a drawback of one cent, in a coupon payable at its office. The Court decided that the company had no right under the law to charge more than eleven cents for the distance mentioned, and condemned the rule in the severe terms above quoted.

I have not intended to intimate any opinion on the propriety of the verdicts rendered in these cases; but merely to maintain that, according to repeated adjudications of this Court, the question of exemplary damages was properly left to the jury in each case. I think that the judgments in both cases ought to be affirmed.